559 F.2d 845
 10 ERC 1394, 182 U.S.App.D.C. 224, 7
Envtl. L. Rep. 20,633
 NATIONAL TANK TRUCK CARRIERS, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Traffic Executive Association Eastern Railroads, and Western
Railroad Association et al., Intervenors.
 No. 76-1522.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 8, 1977.
Decided July 12, 1977.
 
 Marshall Kragen, Washington, D. C., with whom Harry C. Ames, Jr., Washington, D. C., was on the brief, for petitioner.
 Kenneth P. Kolson, Atty., I. C. C., for respondents. Mark L. Evans, Gen. Counsel, Charles H. White, Associate Gen. Counsel, and Peter A. Fitzpatrick, Atty., I. C. C., and Lloyd John Osborn, Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents.
 John J. Paylor, of the bar of the Supreme Court of Virginia, pro hac vice, by special leave of court, with whom Robert G. Seaks, Washington, D. C., and Joseph D. Feeney, Chicago, Ill., were on the brief, for intervenors Traffic Executive Ass'n Eastern Railroads and Western Railroad Ass'n et al.
 Before WRIGHT and WILKEY, Circuit Judges, and JONES,* Senior District Judge.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 We consider in this case the validity under the Interstate Commerce Act[1] of an order entered by the Interstate Commerce Commission in a rulemaking proceeding. Transportation of "Waste" Products for Reuse and Recycling (General Motor Carrier Licensing), 124 M.C.C. 583 (1976) (Transportation II ). The essence of the order and accompanying report and the focus of disagreement in this suit is the ICC's finding that the present and future public convenience and necessity require additional motor carrier service, authorized by "special certificates," to transport waste products for recycling in furtherance of "a recognized pollution control program." Id. at 584.
 
 
 2
 Petitioner National Tank Truck Carriers, Inc., together with various rail carriers who have intervened in the petition for review, contend that this finding lacks a rational basis. They further contend that the challenged order is inconsistent with the decision in Chemical Leaman Tank Lines, Inc. v. United States, 368 F.Supp. 925 (D.Del.1973) (three-judge court), in which the court remanded to the ICC for further proceedings an earlier order of the Commission on the same basic issue. Transportation of "Waste" Products for Reuse and Recycling (General Motor Carrier Licensing), 114 M.C.C. 92 (1971) (Transportation I ).[2] Having considered the ICC's order in Transportation II, the administrative record on which it was based, and the contentions of the parties, we conclude that the challenged order is free from reversible error and we accordingly affirm.
 
 
 3
 * The instant petition for review is only the latest event in the lengthy administrative and judicial history of the controversy over the ICC's attempt to issue special operating authority enabling carriers to transport certain waste materials. The impetus for the original version of the regulations, adopted in 1971, was the mandate of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332 (1970, as amended Supp. V 1975), and, more specifically, Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5 1970). That Order directed all federal agencies to review, among other things, their licensing regulations and policies so as to ensure full compliance with NEPA, and to implement incentives and regulations directed toward reusing and recycling a far greater proportion of waste materials. Shortly after Executive Order 11514 was issued the ICC published a notice of proposed rulemaking, 114 M.C.C. 92 (1971), concerning licensing regulations for waste products. The ensuing rulemaking proceeding resulted in the Transportation I report and order which contained a lengthy discussion of the need for streamlining the procedures for issuance of special certificates for motor carriers engaged in transporting waste products used in recycling in furtherance of recognized pollution control programs. The ICC, in that report, concluded that the public convenience and necessity and, more broadly, "the national effort to save and restore our American environment," would be well served by implementation of procedures for expedited consideration. Transportation I, supra, 114 M.C.C. at 111. In view of this "general, prospective finding of 'public convenience and necessity,' "[3] the Commission proposed that individual applicants for certification need only establish (1) that they will transport an eligible waste product pursuant to a "recognized pollution control program," and (2) that they comply with the usual Commission tests for carrier fitness. Chemical Leaman Tank Lines, Inc. v. United States, supra, 368 F.Supp. at 929. Applicants for certification would not, therefore, be required to make an individualized showing of public convenience and necessity. Id.; Transportation I, supra, 114 M.C.C. at 124.[4] Significantly, however, under the Transportation I order no information was to be requested from the sponsor of the pollution control program; notice of individual applications was not required to be provided to existing carriers; and the Commission had not prepared an environmental impact statement.
 
 
 4
 As in this case involving Transportation II, representatives of the tank trucking industry challenged the ICC's Transportation I order in court, and certain railroad interests intervened in support of the challenge. Chemical Leaman Tank Lines, Inc. v. United States, supra. The three-judge District Court sustained the ICC's authority to issue a national finding of public convenience and necessity for the waste products service, 368 F.Supp. at 932-936, held that the Commission's election to proceed by rulemaking rather than adjudication was proper, id., and upheld its findings that the rules would serve a useful purpose responsive to a public need, id. Particularly pertinent here, however, the court remanded the case to the Commission because of its failure adequately to consider two of the three factors that, under Pan American Bus Lines Operations, 1 M.C.C. 190 (1936), should be considered prior to issuance of motor carrier licenses. The three factors set forth in the Pan American case are: (1) whether the proposed service will serve a "useful public purpose," demand, or need; (2) whether this purpose can be equally well served by existing carriers; and (3) whether the new service can be provided without "endangering or impairing the operations of existing carriers contrary to the public interest" and national transportation policy. 1 M.C.C. at 203. The Chemical Leaman court ruled that the ICC had articulated the basis for its finding that the first criterion had been satisfied, but further held that the Commission had failed to articulate sufficiently the basis for its conclusion that the second and third tests had been met. 368 F.Supp. at 943-946. The District Court also held that the Commission erred in failing to prepare an environmental impact statement, id. at 946-949, and in depriving competing carriers of adequate notice of and opportunity to oppose individual applications, id. at 949-951.[5]
 
 
 5
 On remand the Commission issued a second notice of proposed rulemaking containing an amended version of the rules and inviting public comment. 124 M.C.C. 594 (1974). Fourteen parties responded, including three federal agencies[6] and petitioner and intervenors here. On April 6, 1976 the ICC adopted a modified version of this second rulemaking proposal, 124 M.C.C. at 599-601, and issued an accompanying report.
 
 II
 
 6
 Our study of the ICC's order and report in Transportation II convinces us that it has corrected the infirmities that prompted the remand in Chemical Leaman. In Chemical Leaman the court noted the ICC's failure to support its conclusion that the second Pan American criterion was satisfied, i. e., that existing carriers would not provide the needed transportation services. In Transportation I the Commission stated that transportation of waste products would constitute largely new traffic and existing motor and rail carriers either would not or could not handle such growth. 114 M.C.C. at 106. But the court found that the facts and analysis to support this conclusion were lacking. Chemical Leaman, supra, 368 F.Supp. at 944. In Transportation II, however, the Commission offered ample "affirmative assurance that the point has been examined and rationally decided * * *." Id. at 945. The ICC stated that existing "carriers simply have not furnished the Commission with sufficient data upon which it could be found that the service proposed will be performed as well by existing carriers * * *." Transportation II, 124 M.C.C. at 590. It noted further that there is "good reason to believe, based upon the evidence and our study of the waste products problem generally," that the need for transportation will grow substantially in the future, and that existing carriers "cannot or will not completely meet that need." Id., and see id. at 591. The Commission found that many shippers have already experienced difficulty in obtaining carriers for transportation of waste needed for recycling, id. at 596, and that existing carriers could not be attracted to the waste products involved because of their low value, id. at 595-596. Our review of the record suggests no justification for disturbing these findings.
 
 
 7
 In Chemical Leaman the court also pointed out that, while the ICC had considered the third Pan American criterion impairment to existing motor carriers and had concluded that diversion of current business from those carriers would be insubstantial, the Commission had failed to explain how it reached the assumption underlying this conclusion. 368 F.Supp. at 943. That assumption was that the definition in the regulations of a waste product "narrowed the proposed service to a field from which existing carriers do not currently derive substantial traffic or revenue." Id. In Transportation II, however, the Commission found that many carriers are currently not interested in handling the available business in qualifying waste products, 124 M.C.C. at 596, so they can hardly be considered likely to suffer injury if it is handled by others. Also, Transportation II imposed new requirements for a detailed description of the pollution control program and a letter of support from the sponsor of the program. These requirements should prevent specially certified carriers from hauling anything other than qualifying "waste products" and will tend to "insure that traffic moving pursuant to (a) Special Certificate will not be diverted from existing modes of transportation." 124 M.C.C. at 589.[7]
 
 
 8
 The court in Chemical Leaman specifically criticized the Commission for its failure to make a finding as to the substantiality of railroad revenues from current transportation of waste materials, including scrap. 368 F.Supp. at 944. This flaw was also remedied in Transportation II. The Commission has now explicitly found that the scrap to be transported pursuant to special certificates is expected to be less valuable than the industrial waste and processed scrap now hauled by the railroads. 124 M.C.C. at 595-596. These waste materials, said the Commission, would absent the new service normally be discarded because competitive rail rates make it too expensive to move. Id. Thus the proposed service is not expected to result in "a material diversion" of business from existing rail carriers. Id. We see no tenable ground on which to refute these findings or to fault the Commission's analysis.
 
 
 9
 The order of the Interstate Commerce Commission is
 
 
 10
 Affirmed.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 294(c) (1970)
 
 
 [1]
 Part II, 49 U.S.C. §§ 301 to 327 (1970 & Supp. V 1975)
 
 
 [2]
 Jurisdiction in the District Court was predicated on 28 U.S.C. §§ 2284 & 2325 (1970). Chemical Leaman Tank Lines, Inc. v. United States, 368 F.Supp. 925, 928 (D.Del.1973) (3-judge court). Since the decision in Chemical Leaman, however, the statutory scheme governing judicial review of ICC orders was substantially changed. Pub. L. No. 93-584, 88 Stat. 1917. See Aluminum Co. of America v. ICC, 180 U.S.App.D.C. ----, 553 F.2d 1268, 1269-1270 (1977) (per curiam ). Under the existing statutory scheme for judicial review, 28 U.S.C. § 2342 (Supp. V 1975) vests jurisdiction of the instant suit in the Court of Appeals
 
 
 [3]
 Chemical Leaman Tank Lines, Inc. v. United States, supra note 2, 368 F.Supp. at 929
 
 
 [4]
 As the Commission later stated, it considers streamlining of procedures necessary "in order to make this transportation (which customarily has a small profit margin) more attractive to the regulated motor industry." Transportation of "Waste" Products for Reuse and Recycling (General Motor Carrier Licensing), 124 M.C.C. 583, 584 n.1 (1976) (Transportation II )
 
 
 [5]
 Neither the tank truck carriers nor the railroad trade associations intervening here have raised these final two issues in the present case. An environmental impact statement accompanies the most recent report, and the regulations have been amended to correct the notice problem. See 124 M.C.C. at 591-592; intervenors' br. at 7 n.3
 
 
 [6]
 The Environmental Protection Agency and the Departments of Transportation and the Interior favored adoption of the amended rules. 124 M.C.C. at 585
 
 
 [7]
 Petitioner argues that liquid commodities moving in bulk should be exempted from the regulations and that the administrative record contains evidence that there was no need for these commodities to be included in the blanket grant. Petitioner's br. at 13. However, the agency's power to prescribe regulations affecting the entire motor carrier industry or any class of carriers is well established. American Trucking Ass'ns, Inc. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Even if the ICC's regulations were to disadvantage a particular segment of the trucking industry more than others, a premise without support on the record here, that fact alone would not change their generalized nature or affect their validity. United States v. Florida East Coast R. Co., 410 U.S. 224, 246, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973)